**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| JENAFER ANNMARIE MILANOWSKI, | ) | CASE NO. 4:25-CV-1587 |
| | ) | |
| Plaintiff, | ) | JUDGE CHRISTOPHER A. BOYKO |
| | ) | UNITED STATES DISTRICT JUDGE |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL | ) | JENNIFER DOWDELL ARMSTRONG |
| SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

**I.      INTRODUCTION**

The Commissioner of Social Security denied Plaintiff Jenafer Annmarie Milanowski's

application for a period of disability and Disability Insurance Benefits (DIB). Ms. Milanowski

seeks judicial review of that decision pursuant to 42 U.S.C. § 405(g). (Compl., ECF No. 1.) This

matter is before me pursuant to Local Rule 72.2(b). (*See* ECF non-document entry dated July 30,

2025.)

For the reasons set forth below, I RECOMMEND that the Court REVERSE the

Commissioner's final decision and REMAND this matter for further proceedings consistent with

this Report and Recommendation.

**II.      PROCEDURAL HISTORY**

In January 2023, Ms. Milanowski applied to the Social Security Administration (SSA)

seeking DIB. (Tr. 199.)[1] She initially claimed that she became disabled on January 25, 2022. (*Id.*)

She identified 10 allegedly disabling conditions: (1) autism; (2) attention-deficit/hyperactivity

---

[1] The administrative transcript appears at ECF No. 6. I will refer to pages within the transcript by identifying the Bates number printed on the bottom right-hand corner of the page (e.g., "Tr. 27"). I will refer to other documents in the record by their CM/ECF document numbers (e.g., "ECF No. 8") and page-identification numbers (e.g., "PageID# 1408").

disorder; (3) dissociative disorder; (4) complex post-traumatic stress disorder; (5) fibromyalgia, tendonitis, polyarthritis, and polymyalgia; (6) trochanteric hip bursitis; (7) bicuspid aortic valve; (8) major depressive disorder; (9) chronic rhinitis; and (10) generalized anxiety disorder. (Tr. 230.)

The SSA denied Ms. Milanowski's application initially and upon reconsideration. (Tr. 85, 92, 94, 102.) Ms. Milanowski requested a hearing before an administrative law judge (ALJ). (Tr. 120.) The ALJ held a hearing on December 20, 2023, at which Ms. Milanowski was represented by counsel. (Tr. 33–57.) Ms. Milanowski testified, as did an independent vocational expert (VE). (*Id.*)

On July 30, 2024, the ALJ issued a written decision finding that Ms. Milanowski is not disabled. (Tr. 14–27.) Ms. Milanowski requested review of the ALJ's decision. (Tr. 194.) Her counsel submitted a brief identifying alleged errors in the decision. (Tr. 307–10.)

On May 30, 2025, the Appeals Council denied review, rendering the ALJ's decision final. (Tr. 1.)

On July 29, 2025, Ms. Milanowski filed her Complaint, challenging the Commissioner's final decision that she is not disabled. (ECF No. 1.) Ms. Milanowski asserts the following assignments of error for review:

> **First Assignment of Error:** The ALJ erred in failing to articulate any consideration of the opinion of Carla Arlien, Ph.D.
>
> **Second Assignment of Error:** The ALJ erred in his evaluation of fibromyalgia and subjective symptoms.
>
> **Third Assignment of Error:** The ALJ erred in his evaluation of the opinions of Drs. Hughes and Cacchillo, state agency medical consultants.
>
> **Fourth Assignment of Error:** The ALJ erred in his evaluation of the opinions of Drs. Edwards and Boulou-Sophy, state agency psychological consultants.

**Fifth Assignment of Error:** The ALJ erred in his evaluation of the opinion of treating primary care provider, Dr. Selim.

**Sixth Assignment of Error:** The ALJ erred in failing to consider evidence after the date last insured.

(Pl.'s Merit Br. at 13, 17, 19, 21, 22, 23, ECF No. 8, PageID# 1408, 1412, 1414, 1416, 1417, 1418.)

## III.    BACKGROUND

### A.    Personal, Educational, and Vocational Experience

Ms. Milanowski was born in February 1998 and was 25 years old on the date of her application. (Tr. 35, 199.) She graduated from high school. (Tr. 39, 231.) She lives with her boyfriend. (Tr. 38.) She has a driver's license. (*Id.*) She previously worked for a retail pharmacy store as a cashier and pharmacy technician. (Tr. 40–43.)

### B.    Previous Application for Benefits

Ms. Milanowski previously filed an application for DIB and SSI on October 20, 2020. (Tr. 61.) On January 28, 2022, an ALJ issued a written decision finding that Ms. Milanowski was not disabled. (Tr. 58–73.) On November 18, 2022, the Appeals Council denied review of that decision. (Tr. 79.)

### C.    Function Reports

Ms. Milanowski wrote to the agency, describing "daily meltdowns" due to pain, anxiety, "sensory issues," and PTSD. (Tr. 238.) She said that, during a meltdown, she will "shut[] down" and can "barely think or move"; she has to lie down sometimes. (*Id.*) She described body pain that "is everywhere, in every joint and all of [her] connective tissue." (*Id.*) She has autism and lacks "body awareness," which leads her to hyperextend her body. (*Id.*) She is in pain and is stressed out every day, and doing things like walking, standing, sitting, bending, and stretching can cause her severe pain. (*Id.*) She has attempted suicide twice, most recently in 2017. (*Id.*) She still struggles with self-harm. (*Id.*)

3

She also has difficulty knowing if she is hot or cold, hungry, or tired. (*Id.*) Her sleep is "extremely interrupted." (*Id.*) She said that a good day would be waking up with pain only at a 5 out of 10 and being able to complete a few simple tasks like showering, cooking a meal, and vacuuming. (*Id.*) But a bad day (which is most days) will have her waking up with pain that is a 9 out of 10 and not being able to get out of bed even to eat. (*Id.*)

Ms. Milanowski completed a function report on February 16, 2023. (Tr. 240–47.) She wrote that she cannot multitask and is easily distracted. (Tr. 240.) She cannot lift more than five pounds or stand longer than 20 or 30 minutes. (*Id.*) She has poor communication and a "limited understanding of tasks." (*Id.*) She is uncoordinated and clumsy and moves at a slow, delayed pace. (*Id.*) She has depression and anxiety, does not take direction well, and is afraid of strangers and going outside. (*Id.*) She "cannot function under pressure." (*Id.*)

Ms. Milanowski described a normal day as one in which she alternates between pacing, having anxiety attacks or meltdowns, and engaging in stretching or breathing exercises. (Tr. 241.) She has no motivation to shower, experiences pain from overstimulation, and cries often. (*Id.*) She wears noise-reducing earplugs. (*Id.*)

Ms. Milanowski said that her sleep was "very interrupted" because she has anxiety attacks and nightmares, and her pain wakes her up. (*Id.*) She finds that, when it comes to dressing herself, she is disheveled, lazy, and dirty; she has pain bending to dress. (*Id.*) She bathes and cares for her hair once a week due to her depression, sensory pain, and pain in bending and standing. (*Id.*) She eats out four days per week, and she will also either microwave meals or skip meals entirely. (*Id.*) She will only use the restroom at home; using the restroom at other places causes her to have a meltdown. (*Id.*)

4

Ms. Milanowski uses alarms, sticky notes, or relies on others to remind her to take her medicine and see to her personal needs and grooming. (Tr. 242.) She vacuums once a month, does laundry once a month, and loads and runs the dishwasher twice a month. (*Id.*) She does not do other housework because it is "too hard mentally, emotionally, [and] physically." (Tr. 243.)

Ms. Milanowski does not drive because it is too overwhelming and scary. (*Id.*) She is not able to go out alone because she will have an anxiety attack. (*Id.*) She goes outside a couple times per week, only to go to the car. (*Id.*) She shops for groceries on the computer around once per month. (*Id.*) She is not able to pay bills or handle checks or a bank account because "they are confusing." (*Id.*)

A few times a week, Ms. Milanowski will watch television, play a computer game, or paint. (Tr. 244.) But she finds herself giving up on these hobbies. (*Id.*) She avoids her neighbors and does not go places other than to her doctors' appointments. (*Id.*)

Ms. Milanowski estimated that she can walk for a quarter mile before needing to stop and rest for about five minutes. (Tr. 245.) She can pay attention for about 10 or 15 minutes at a time. (*Id.*) She does not follow written or spoken instructions well, and authority figures scare her. (*Id.*) She does not handle stress well, and changes in routine cause her to have a meltdown. (Tr. 246.)

Ms. Milanowski wears custom orthotics and uses ankle and wrist braces at night and when her pain flares up. (*Id.*)

In May 2023, Ms. Milanowski wrote to the agency that she had been using a cane every day. (Tr. 250.) She wrote that she had previously omitted that she had been diagnosed with agoraphobia, and she specified that her specific dissociative disorder was dissociative identity disorder. (*Id.*) She wrote that she had suffered from a dissociative identity since childhood, but it had only become disabling in the last five years. (*Id.*) She wrote that she cannot bend over to tie

her shoes or pick things up off the floor. (Tr. 255.) She cannot bend to pick up groceries. (*Id.*) She cannot carry a laundry basket. (*Id.*) She needs to shower sitting down. (*Id.*) She has sleep disturbances from pain. (*Id.*) She is "bedridden" most days due to fibromyalgia pain. (*Id.*)

### D.       Relevant Hearing Testimony

#### 1.       Ms. Milanowski's Testimony

Ms. Milanowski worked for a retail pharmacy store until July 2020, when she had a "psychotic break and a mental breakdown." (Tr. 43.) She said that her supervisors wanted her to do "multiple things at work that I couldn't understand," and "they weren't helping me at all." (*Id.*) She also said that she was experiencing a lot of pain from having to stand during an eight-hour shift, it was fast-paced and stressful, and there came a point that she "just . . . couldn't keep up with it." (*Id.*)

Since leaving that job, her mental and physical health have declined. (Tr. 43–44.)

Ms. Milanowski has fibromyalgia pain, which presents in her hip, wrist, feet, knees, shoulders, neck, and joints. (Tr. 44.) Her pain has gotten worse since 2020, particularly in her back, knees, and feet. (*Id.*) Ms. Milanowski testified that she will "pass out" if she stands for two hours. (Tr. 45.)

Ms. Milanowski has been seeing a counselor for two years. (Tr. 45.) She had been going every week, but recently had only been going every other week. (*Id.*) She intends to return to weekly sessions. (Tr. 46.) Ms. Milanowski described that she has flashbacks, panic attacks, crying spells, and "meltdowns." (*Id.*) She said that she had found herself hurting herself, including by hitting herself in the head. (*Id.*) She said that a professional had called her condition dissociative identity disorder stemming from childhood trauma. (*Id.*)

She said that if she gets overwhelmed, she will "revert back to being a child." (*Id.*) She will "get real spacey" and will play with toys during these periods, which happen "a lot." (Tr. 46–47.)

6

Ms. Milanowski has found that Valium helps with the physical symptoms of her panic attacks, and Wellbutrin controls her suicidal thoughts. (Tr. 47–48.) But she still gets "really depressed" and cries frequently. (Tr. 48.) She cries twice a day, nearly every day. (*Id.*)

On the day before the hearing, Ms. Milanowski woke up around noon and took her medicine. (Tr. 50.) She then laid down for an hour and "cried a little bit." (*Id.*) She then got up and ate; she went to the living room and tried watching television to quiet the intrusive thoughts she had been having due to her anxiety. (*Id.*) Yesterday, though, this did not work, and she ultimately had a "meltdown" that had her crying and panicking. (*Id.*) She threw herself on the floor and started hitting herself in the head until she grew tired and returned to bed for a couple hours. (*Id.*) She then watched more television, ate something in the kitchen, and then laid on the floor and cried. (*Id.*) She played an online game for about an hour, then rested in bed for an hour, then ate again, then watched television again. (*Id.*) She went to bed for the night around midnight. (Tr. 51.)

Ms. Milanowski described that she has trouble falling asleep due to physical pain in her lower back and hips, as well as from intrusive thoughts. (*Id.*) She will wake up three or four times throughout the night and has nightmares. (*Id.*)

Ms. Milanowski does not have friends or family, and she does not really leave the house. (Tr. 51–52.) She watches television and occasionally plays the online game she mentioned, but otherwise she has no hobbies. (Tr. 52.)

Ms. Milanowski testified that driving scares her, so she does not drive often. (Tr. 38–39.) She has panic attacks when driving. (*Id.*) She did not drive at all in 2022, but in 2023 she drives once every other week, to doctors' appointments. (*Id.*)

### 2.     *Vocational Expert's Testimony*

George Coleman testified as a vocational expert ("VE") at the hearing. (Tr. 53.) The ALJ asked the VE to assume that a hypothetical person with Ms. Milanowski's age, education, and work experience was limited to work at the medium exertional level with several additional limitations. (Tr. 53–54.) Specifically, the person could frequently climb ramps and stairs but could not climb ladders, ropes, or scaffolds. (*Id.*) They could frequently stoop, kneel, crouch, and crawl. (*Id.*) They must avoid unprotected heights. (*Id.*) They are limited to simple, routine, and repetitive tasks, and their work must not require a production rate pace (like assembly line work). (*Id.*) They can have occasional, superficial interaction with supervisors and coworkers, meaning that their work must not include tandem or collaborative tasks or the management, direction, or persuasion of others. (*Id.*) They can have no interaction with the public. (*Id.*) Their work should involve few changes in a routine work setting, which changes are easily explained or demonstrated in advance of gradual implementation. (*Id.*)

The VE testified that such a person could not perform Ms. Milanowski's past relevant work but could perform the work of a laundry worker (DOT 361.685-018), linen room attendant (DOT 222.387-030), or janitor (DOT 381.687-018). (Tr. 54.) The VE further testified that employers will tolerate a worker who is off task for up to 10 percent of the workday or a worker who is absent up to once per month. (Tr. 55.) Above that, employers would likely issue discipline leading from a verbal warning to ultimately dismissal. (*Id.*)

In response to questions from Ms. Milanowski's counsel, the VE testified that employers will tolerate an employee who needs reminders or assistance from coworkers and supervisors to complete their tasks, so long as the requests do not reach the occasional (or more than occasional)

level. (Tr. 56.) The VE confirmed that no competitive work would be available to a person who needs to lie down during the workday for at least one hour outside of regular work breaks. (*Id.*)

E.   State Agency Consultants

A disability examiner (KariAnne Killilea-Payne), a physician (Leon Hughes, M.D.), and a psychologist (Sallie Boulous-Sophy, Ph.D.) reviewed Ms. Milanowski's claim at the initial review level. (Tr. 85–93.)

Drs. Hughes and Boulous-Sophy found that the evidence in the file did not document any new conditions or changes in Ms. Milanowski's conditions that would preclude the adoption of the prior ALJ's rulings. (Tr. 89, 90–91.)

Dr. Hughes opined that Ms. Milanowski remained capable of medium work except that she is limited to frequent stooping, crawling, crouching, and climbing ramps and stairs. (Tr. 91.) She must never climb ladders, ropes, or scaffolds and must avoid all exposure to unprotected heights. (*Id.*)

Dr. Boulous-Sophy, in adopting the previous findings ALJ's findings, found moderate limitations in Ms. Milanowski's ability to interact with others; adapt or manage herself; concentrate, persist, and maintain pace; and understand, remember, or apply information. (Tr. 88.) Dr. Boulous-Sophy limited Ms. Milanowski to the performance of simple, routine, and repetitive tasks conducted in a setting free of high production-rate pace, which setting is non-public. (Tr. 91.) She wrote that "the work must require no more than occasional and superficial [defined as precluding group, tandem or collaborative tasks, as well as tasks involving the management of, direction of, or persuasion of, others] interaction with co-workers and supervisors, which setting is routine, and relatively static, in that it contemplates occasional changes, easily explained and/or demonstrated in advance of gradual implementation." (*Id.*)

9

The consultants wrote that Ms. Milanowski's statements about her symptoms and limitations were partially consistent with the evidence, noting that Ms. Milanowski "is able to care for herself and complete tasks independently." (Tr. 90.)

Based on these opinions, the consultants concluded that Ms. Milanowski could perform the work of a "cleaner-sweeper" (DOT 389.683-010), "laundry worker" (DOT 361.685-018), or "kitchen helper" (DOT 318.687-010) and was not disabled. (Tr. 92.)

In a letter to Ms. Milanowski explaining this decision, the Agency wrote that the evidence showed that she had back pain, arthritis, and psychological impairments but nevertheless could walk without assistance and complete tasks independently. (Tr. 107.)

A disability examiner (Amanda Smith), physician (James Cacchillo, M.D.), and psychologist (Kevin Edwards, Ph.D.) reviewed Ms. Milanowski's claim at the reconsideration level. (Tr. 94–102.)

On reconsideration, the consultants noted that Ms. Milanowski had alleged worsening of her physical conditions after the previous ALJ's decision, but they wrote that the worsening was "noted to take place after [the date last insured]." (Tr. 98, 99.) The consultants affirmed the initial-level findings after determining that those findings were consistent with evidence. (Tr. 98, 99–100.)

Additionally, Dr. Edwards noted that Ms. Milanowski alleged the addition of new mental health conditions after the DLI, including agoraphobia and dissociative identity disorder. (Tr. 100.) Dr. Edwards again noted that the worsening was noted to have taken place after the DLI, but he also noted that the medical records "do not support [the] new conditions." (*Id.*)

The consultants therefore affirmed that Ms. Milanowski was not disabled. (Tr. 102.)

10

In a letter to Ms. Milanowski explaining this decision, the Agency wrote that she is able to interact with others and walk unassisted, and the evidence shows that she could be capable of performing work completing simple tasks in "less exertional environments." (Tr. 119.)

## F.  Relevant Medical Evidence

Ms. Milanowski presented to the emergency department on July 1, 2021. (Tr. 375.) She stated that she had developed multiple personalities over the years, one of which believes that she has Ehlers-Danlos syndrome. (*Id.*) After she "went into that personality," she began having pain "all over." (*Id.*) When she could not "switch out," she called an ambulance. (*Id.*) But by the time she got to the hospital, she was back at her baseline and all her symptoms had "completely resolved." (*Id.*) EMS personnel had administered an antipsychotic medication en route to the hospital. (Tr. 377.) At the hospital, Ms. Milanowski said that she wished to be discharged and would follow up outpatient with psychiatry. (Tr. 376.) She was discharged. (Tr. 377.)

When Ms. Milanowski consulted with primary care doctor Suzan Selim, M.D., on November 2, 2021, she was still looking for a psychiatrist. (Tr. 369.) She reported sinus congestion and ear pain. (*Id.*) She also complained of back pain and myalgias. (*Id.*) On examination, in addition to positive sinus findings, Ms. Milanowski displayed "mild" tenderness to palpation in the anterior axillary fold and in the medial fat pad of the knee. (Tr. 370.) Dr. Selim prescribed an antibiotic and an antihistamine for the ear and sinus issues, referred Ms. Milanowski to a psychiatrist, and advised her to walk more to improve her cholesterol levels. (Tr. 370–71.)

Ms. Milanowski underwent a neuropsychological evaluation with Carla Arlien, Ph.D., on December 3, 2021. (Tr. 482.) Ms. Milanowski reported that she was independent with respect to her activities of daily living but said that she had short-term memory loss and attention difficulties, and she was taking "longer to think" than usual. (*Id.*) She said that she was anxious, worries, has panic attacks, and is depressed. (*Id.*) She said that she "dissociates" and had experienced trauma.

11

(*Id.*) She reported that she had quit working at the retail pharmacy "due to . . . bursitis in her hip." (Tr. 484.)

On examination, Ms. Milanowski was well-groomed with appropriate behavior, a cooperative attitude, appropriate affect, logical thought processes, intact long-term memory, good judgment and insight, and a mostly accurate fund of knowledge. (Tr. 484.) She was anxious and depressed in her mood, and her short-term memory was "mildly impaired." (*Id.*)

On psychological testing, Ms. Milanowski's auditory attention and complex divided auditory attention fell in the average range, and her ability to mentally sequence a string of numbers fell in the above average to average range. (Tr. 486.) Her mental processing and visual processing speeds fell in the impaired range, with Dr. Arlien writing "(<1st percentile)." (Tr. 487.) And it was the same for her basic visual organization and construction skills. (*Id.*) But her basic visual perception was intact, and she was average to above average in visual spatial perception. (*Id.*) Her scores fell in the borderline impaired range for semantic verbal fluency, recall of a story after a long delay, and mental flexibility. (*Id.*) Her encoding of verbal information presented in a meaningful context was impaired. (*Id.*)

Depression and anxiety screening revealed severe depression and anxiety. (*Id.*) Autism screening showed scores consistent with autism spectrum disorder. (Tr. 487–88.) Her scores on another questionnaire put her in the "highly probable" range of having ADHD. (*Id.*)

In summarizing her conclusions, Dr. Arlien wrote that Ms. Milanowski's cognitive test results were consistent with ADHD, combined type. (Tr. 488.) Dr. Arlien diagnosed Ms. Milanowski with ADHD, combined type; generalized anxiety disorder; and dysthymic disorder (persistent depression). (*Id.*) She included "rule-out" diagnoses of avoidant personality disorder,

schizoaffective disorder, and dependent personality disorder. (*Id.*) She identified a history of PTSD, noting that the diagnosis was "per patient report." (Tr. 489.)

Dr. Arlien then included a list of "recommendations," which included minimizing distractions and taking frequent short breaks when doing tasks that require attention, as this "may help with the attention problems seen on testing." (*Id.*) She recommended that Ms. Milanowski set an alarm to take a break every 30 to 40 minutes, setting another alarm for the allotted break time (e.g., five to ten minutes) so she remembers to return to the task at hand. (*Id.*) And she recommended that "repetition of information may help with recall," "as the repetition facilitated recall on testing." (*Id.*) Dr. Arlien wrote that ADHD medication was recommended if these strategies did not help with her attention and memory difficulties. (*Id.*) She also recommended increasing physical exercise, in particular cardiovascular exercise. (*Id.*)

Ms. Milanowski consulted with cardiologist Dr. Joseph Graziano on February 25, 2022. (Tr. 924.) Ms. Milanowski endorsed a cardiac murmur with occasional dizziness and palpitations. (*Id.*) But she said she had been feeling well without syncope. (*Id.*) She was still having occasional palpitations but said "usually if she [calms] herself down it seems to improve." (*Id.*) On examination, she was very pleasant and well groomed. (Tr. 925.) Dr. Graziano did not hear a murmur or appreciate any other cardiac abnormalities. (*Id.*) An echocardiogram was normal, with the exception of an apparent bicuspid aortic valve without significant complications. (Tr. 926.) There was no indication of exertional syncope or near syncope. (*Id.*) Dr. Graziano advised Ms. Milanowski, among other things, to try to exercise regularly and to follow up in one year. (*Id.*)

Ms. Milanowski followed up with a certified nurse practitioner in a rheumatology practice on March 1, 2022. (Tr. 517.) She reported that she had been treating with a psychiatry practice, with improvement to her anxiety "and thus her pain is improved." (*Id.*) On examination, Ms.

13

Milanowski was minimally tender on the neck with present left subscapular trigger points. (Tr. 519.) Her lower back was diffusely tender, into the left buttock. (*Id.*) There was extreme tenderness over the left trochanteric bursa, with mild tenderness over the right. (*Id.*) The examination was otherwise normal except for an anxious and agitated mood and affect; she had full range of motion in the neck. (*Id.*)

The nurse practitioner identified a diagnosis of fibromyalgia and advised a "graded cardiovascular exercise routine" and home stretching regimen. (*Id.*) They "discussed some formal physical therapy if things persist." (*Id.*)

Ms. Milanowski saw Dr. Selim on March 23, 2022, complaining of congestion and sinus issues. (Tr. 361.) A physical examination was normal. (Tr. 362.) Dr. Selim prescribed new medication for the sinus trouble and recommended consultation with a rheumatologist for a second opinion regarding her "bursitis tendinitis and hypermobility and diffuse joint pains." (Tr. 363.)

Ms. Milanowski returned to Dr. Selim on May 4, 2022, complaining of back pain and ADHD. (Tr. 354.) She was thoroughly tender over the sacroiliac joints on palpation, and there was tenderness over the trochanteric bursa on both sides as well. (Tr. 355–56.) With respect to her attention, Ms. Milanowski said that she had difficulty sustaining attention, organizing tasks, is easily distracted, does not follow through on instructions, and is often forgetful. (Tr. 355.) She said she fidgets, squirms, and talks excessively. (*Id.*) Dr. Selim ordered x-ray imaging of the hips and back. (Tr. 355–56.)

Ms. Milanowski met with Dr. Selim again on July 18, 2022. (Tr. 345.) She said she had not made it in to see the rheumatologist due to a car accident, but that the appointment had been rescheduled. (*Id.*) She had not scheduled the x-ray imaging because she did not realize she had to do that herself, and she said at this point she preferred to meet with the rheumatologist first. (*Id.*)

She complained of anxiety and said she was still having issues with the hyperextensibility of her joints. (*Id.*) She said she sometimes got out of bed and walked around, almost as if sleepwalking. (*Id.*) She complained that stimulant medication, prescribed for ADHD, made her "dissociation" worse. (*Id.*) Dr. Selim made medication changes and advised to address the attention issues with her psychiatric providers. (Tr. 347.)

Ms. Milanowski consulted with rheumatologist Frank Migliore, D.O., on August 8, 2022. (Tr. 342.) She reported that she had experienced diffuse body pain and is achy "all over all the time." (Tr. 343.) She described that her skin is sometimes sensitive to the touch, and her joints crack "a lot." (*Id.*) She sometimes feels a burning pain sensation, but she has not noticed any joint swelling. (*Id.*) Her pain seems to be worse after activity. (*Id.*) She "is pretty flexible." (*Id.*) She has trouble with sleep. (*Id.*) She goes for a mile walk two or three times a week. (*Id.*)

On examination, she was tender and displayed diffuse allodynia. (*Id.*) She met most of the Beighton criteria for hypermobility. (*Id.*) Dr. Migliore wrote that he suspected Ms. Milanowski's pain to be a combination of her hypermobility and allodynia from fibromyalgia. (Tr. 342.) He saw no signs of an underlying systemic connective tissue disease or inflammatory arthritis, but he ordered additional workup. (*Id.*) Dr. Migliore opined that Ms. Milanowski could try duloxetine for the fibromyalgia and should avoid overextending the joints. (*Id.*)

Ms. Milanowski saw Dr. Selim to follow up on blood work on August 23, 2022. (Tr. 339.) She reported that she continued to feel very fatigued and anxious. (*Id.*) She said that some days, she is so fatigued that she can only shower and eat something. (*Id.*) She said she had been having flashbacks. (*Id.*) On examination, Ms. Milanowski had positive tender points. (Tr. 341.) Dr. Selim prescribed duloxetine for fibromyalgia and wrote that she should see psychiatry "ASAP" due to

15

Ms. Milanowski's reports of "chronic fatigue[,] severe anxiety[,] dissociative disorder[,] and that she is unable to work." (*Id.*)

Ms. Milanowski returned to Dr. Selim on September 2, 2022. (Tr. 332.) She reported that the duloxetine was helping; she felt more energetic, was able to handle some of her anxiety, and had been walking twice weekly. (Tr. 333.) She was trying to get about 5,000 steps a day. (*Id.*) Dr. Selim noted that her dosage should be increased and counseled Ms. Milanowski on increased exercise and diet changes. (Tr. 332–33.)

When Ms. Milanowski returned to the rheumatology practice on September 12, 2022, she reported that her myalgias were stable on the duloxetine and that she had been walking on a regular basis for exercise. (Tr. 438.) Her physical examination was materially unchanged from the previous appointment. (Tr. 440.) The provider continued to recommend a graded cardiovascular exercise routine, but otherwise noted that fibromyalgia symptoms were stable and that Ms. Milanowski could manage the symptoms with her primary care and psychiatry professionals, returning to rheumatology only as needed. (Tr. 441.)

Ms. Milanowski saw Dr. Selim on November 18, 2022, complaining of indigestion and chronic pain in the feet, knees, and ankles. (Tr. 325–26.) She was currently off of duloxetine because of an insurance problem, but she was working to refill the prescription. (Tr. 326.) Dr. Selim referred her to a podiatrist. (Tr. 325–26.)

Ms. Milanowski saw the podiatrist on December 12, 2022. (Tr. 322.) On examination, there was tenderness noted in the medial posterior tibial tendon regions and the arch areas. (Tr. 324.) Valgus issues were noted when she was weightbearing, with an antalgic gait documented. (*Id.*) The podiatrist recommended "conservative care options," including custom foot orthoses "to help

16

alleviate a lot of her lower extremity issues." (Tr. 325.) X-ray imaging of the feet were normal except noting bilateral os tibiale externum. (Tr. 400.)

Ms. Milanowski underwent a psychosocial assessment on January 12, 2023. (Tr. 600.) She reported that duloxetine had "stopped working." (*Id.*) On examination, she was suspicious and guarded with a depressed, anxious, and irritable mood. (Tr. 602.) She was hyperactive, raised her voice, and had circumstantial thought processes. (Tr. 603.) Her oppositional behavior prevented a complete assessment. (Tr. 604.) Her provider gave her a sample of cariprazine to try. (Tr. 600.)

When Ms. Milanowski returned to the provider on January 26, 2023, she reported that the cariprazine had helped with her mood and focus. (Tr. 598.) Her mood was "much improved," and she was "not as angry" on the new medication. (*Id.*) On examination, her mental status, behavior, and speech were all within normal limits. (*Id.*) She was friendly and cooperative. (*Id.*) The provider increased the dosage of the medication. (*Id.*)

Ms. Milanowski was seen for custom orthotics on February 6, 2023. (Tr. 990.)

Ms. Milanowski consulted with an otolaryngologist on February 7, 2023. (Tr. 759.) On examination, she was negative for behavioral problems. (Tr. 760.) Ms. Milanowski reported that she had stopped taking her nasal sprays, and that she believed her allergy medication made her anxiety worse. (*Id.*) The doctor recommended that she continue on one of her nasal sprays for chronic rhinitis and seasonal allergic rhinitis from pollen. (Tr. 761.)

Ms. Milanowski met with a therapist on March 6, 2023. (Tr. 663.) She reported feeling less anxious but said that she was still "very restless." (*Id.*) The therapist noted that she displayed more relaxed body language, increased eye contact, and slower speech than at previous appointments. (*Id.*) Ms. Milanowski described feeling "paralyzed" when she "feels a task is demanded of her." (*Id.*) This was characterized in the note as "pathological demand avoidance," and the two discussed

17

how it was present for Ms. Milanowski when it comes to showering, eating, and elimination behaviors. (*Id.*)

Ms. Milanowski saw Dr. Selim on March 9, 2023, complaining of bilateral knee pain and a cold feeling in her toes and fingers. (Tr. 619.) On examination, there was crepitus in the bilateral knees. (Tr. 621.) Dr. Selim ordered x-ray imaging. (Tr. 621.) Ms. Milanowski reported that she had stopped taking her anxiety medication "due to side effects," and Dr. Selim advised her to consult with her psychiatrist to get an alternative medication. (*Id.*)

When Ms. Milanowski saw her therapist on March 20, 2023, she presented with a euthymic mood. (*Id.*) She said she had been "feeling much better this past week" after being prescribed Adderall (dextroamphetamine and amphetamine combination). (*Id.*) She had painted three days in a row and was able to concentrate on a videogame for two hours. (*Id.*) She was feeling less overwhelmed. (*Id.*) Her mental status examination was normal, except that her mood was both euthymic and anxious. (Tr. 667.)

Ms. Milanowski reported to the podiatrist on March 27, 2023, that her orthotics had been helpful but that she still had "some" pain in her foot. (Tr. 617.) On examination, her gait was improved and her valgus issue was stable. (Tr. 618.) There was some mild tenderness to the sesamoid regions in both feet into the lateral sinus tarsi region. (*Id.*) The podiatrist discussed physical therapy directed at the feet and ankles, in addition to the physical and aquatic therapy that had already been scheduled for knees and other body systems. (Tr. 619.)

When Ms. Milanowski saw her therapist on March 29, 2023, she presented with an "extremely anxious mood" and more childlike behavior and speech (Tr. 669). She described that all of her "pieces/fragments sep[a]rated" after thinking about her past trauma. (*Id.*) She said it was hard for her to "stay integrated into one person" when she feels too stressed. (*Id.*) When discussing

18

her trauma during the session, she became upset and started "arm flapping, rapid breathing, and counting." (*Id.*)

Ms. Milanowski was anxious again at her therapy session on April 12, 2023. (Tr. 672.) She was very upset by the denial of her disability application. (*Id.*)

At the next appointment on April 19, 2023, Ms. Milanowski presented with a "low, anxious mood" and complained of "moderate" pain in her low back and pelvis. (Tr. 675.) She reported moderate to severe pain frequently over the past week, accompanied by anxiety. (*Id.*) She said she had had a panic attack and several episodes of severe anxiety over that period. (*Id.*) On examination, she was unkempt and presented with an anxious and depressed mood and fair insight. (Tr. 675–76.)

At her next appointment on April 26, 2023, Ms. Milanowski presented with an anxious but euthymic mood. (Tr. 679.) She reported that she had begun taking Valium (diazepam) and felt less anxious and less overwhelmed by her emotions. (Tr. 678.) But she described disassociation, reporting that she had dissociative amnesia, often losing several hours at a time, and had several "parts." (*See id.*) She presented to the appointment as a "part" known as "little Jena." (*Id.*) She said she needed to stick to a strict routine "in order to maintain a tolerable amount of stimulus and equanimity." (*Id.*) She said her "main, adult 'part'" was frequently very upset by these dissociative episodes. (*Id.*)

Ms. Milanowski was agitated and depressed at her appointment on May 3, 2023. (Tr. 681.) She endorsed increased depression, to the point that she had difficulty leaving her bed. (*Id.*) She said she believed that her "teenage 'part' holds her depression." (*Id.*) She also had experienced health anxiety, worried that she had lung issues or postural orthostatic tachycardia syndrome. (*Id.*)

19

She reported continued dissociative amnesia and said she had been upset "to not know how she had gotten places or done things and also to have lost hours or days." (*Id.*)

Ms. Milanowski returned to Dr. Migliore on May 16, 2023. (Tr. 614.) She complained of diffuse joint, muscle, and back pain, and said she was tired and weak "all the time." (Tr. 615.) Dr. Migliore noted that Ms. Milanowski had tried duloxetine since the last visit and did not tolerate it. (*Id.*) Dr. Migliore ordered a battery of rheumatological tests and some x-ray imaging. (Tr. 614.)

On May 24, 2023, Ms. Milanowski consulted with Dr. Selmin, complaining of dizziness and a high heart rate upon standing, with lightheadedness and near fainting. (Tr. 1084.) She also complained of muscle aches and pains. (*Id.*) Her physical examination was largely normal. (Tr. 1085.) Dr. Selmin prescribed pregabalin for fibromyalgia pain and noted that Ms. Milanowski had stopped taking Adderall and begun trialing brexpiprazole per psychiatry. (Tr. 1086.)

When Ms. Milanowski saw her therapist on May 24, 2023, she was depressed and anxious, describing that her boyfriend had been angry and moody. (Tr. 688.) On May 31, 2023, she told her therapist that she had not had a panic attack since starting pregabalin and that her pain and anxiety were reduced. (Tr. 691.) The "mean voice" in her head was reduced on brexpiprazole. (*Id.*) Her brexpiprazole was changed to lurasidone before June 14, 2023, due to weight gain, but she presented to an appointment on that date with only "mild to moderate anxiety." (Tr. 694.)

Ms. Milanowski saw Dr. Selim on June 29, 2023, complaining of general body aches and pain in her knees that prevented prolonged standing, as well as fatigue that interfered with activities of daily living such as doing dishes or laundry without breaks. (Tr. 841). Her physical examination was largely normal except for some minor inflammation in the ears and a "nonspecific" rash on the feet. (Tr. 842.)

Ms. Milanowski saw a podiatrist with respect to the rash on July 3, 2023. (Tr. 1017.) On examination, she continued to have tenderness in the posterior tibial tendons and an antalgic gait when weightbearing. (Tr. 1019.) She was given ankle braces for stability. (*Id.*)

Ms. Milanowski underwent a tilt table test on July 27, 2023. (Tr. 943.) The test was negative for POTS and orthostatic hypotension, but it was positive for vasovagal (neurocardiogenic) syncope. (*Id.*) Recommendations included to remain adequately hydrated, avoid alcohol and caffeine, and liberalize salt intake. (*Id.*)

When Ms. Milanowski followed up with the podiatrist on August 7, 2023, she said that she had had to stand for four hours at an event the previous weekend and was experiencing moderate pain. (Tr. 1008.) She complained of bilateral foot and ankle pain and said her braces gave her eczema. (*Id.*) But she admitted that the braces "do help somewhat" with her symptoms. (Tr. 1009.) On examination, there were edema issues in both legs with "mild varicosities" and an antalgic gait noted. (Tr. 1010.) The podiatrist discussed compression stockings and new custom orthotics. (*Id.*)

Ms. Milanowski followed up with Dr. Selim on August 10, 2023. (Tr. 1053.) She complained of indigestion. (*Id.*) Her physical examination was normal. (Tr. 1055.) Dr. Selim made certain medication changes. (Tr. 1058.)

Ms. Milanowski reported some improvement with the new foot orthotics on September 28, 2023. (Tr. 996.) She said she needed some more support, and the orthotics were adjusted with improvement. (Tr. 996–97.)

Ms. Milanowski saw Dr. Selim on October 2, 2023, for complaints related to gastritis. (Tr. 1049.) She was scheduled for an upper endoscopy and advised to avoid fatty foods. (*Id.*)

Ms. Milanowski reported "significant improvement" in her lower extremity symptoms with the newly adjusted orthotics on October 6, 2023. (Tr. 1001.) She said she was having "minimal issues" on a daily basis. (*Id.*)

Ms. Milanowski underwent the upper endoscopy exam on October 16, 2023. (Tr. 1202–03.) The examination revealed gastroesophageal reflux disease (GERD) and gastroparesis. (*Id.*)

## IV.    THE ALJ'S DECISION

The ALJ found that Ms. Milanowski last met the insured status requirements of the Social Security Act on December 31, 2022. (Tr. 20.) He further found that she had not engaged in substantial gainful activity during the period between January 29, 2022 (the day after the previous ALJ decision) and December 31, 2022 (her date last insured, or DLI). (*Id.*)

The ALJ next determined that Ms. Milanowski had the following severe impairments: (1) degenerative disc disease of the lumbar spine with radiculopathy; (2) pes valgus; (3) tendinitis and bursitis; (4) fibromyalgia; (5) anxiety disorder; (6) depressive disorder; and (7) attention-deficit/hyperactivity disorder. (*Id.*)

The ALJ determined that none of Ms. Milanowski's impairments, whether considered singly or in combination, met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 21.)

The ALJ determined that Ms. Milanowski had the residual functional capacity ("RFC") to perform a range of work at the medium exertional level with certain additional limitations. (Tr. 22.) Specifically, Ms. Milanowski can frequently stop, kneel, crouch, crawl, and climb ramps and stairs. (*Id.*) She cannot climb ladders, ropes, or scaffolds, and she must avoid all exposure to unprotected heights. (*Id.*) She is limited to the performance of simple, repetitive, and routine tasks in a setting free of high production-rate pace (like assembly line work). (*Id.*) The work setting must be "non-public." (*Id.*) Her work must include no more than occasional and superficial interaction

22

with coworkers and supervisors. (*Id.*) The ALJ defined "superficial" to mean that the work cannot include group, tandem, or collaborative tasks, nor can it involve the management, direction, or persuasion of others. (*Id.*) Her work setting must be routine and relatively static, in that it contemplates only occasional changes that can be easily explained or demonstrated in advance of gradual implementation. (*Id.*)

The ALJ found that Ms. Milanowski was 24 years old on the date last insured and had at least a high school education. (Tr. 25–26.)

The ALJ then concluded that—considering Ms. Milanowski's age, education, work experience, and RFC—there were jobs that existed in significant numbers in the national economy that she could have performed, including the work of a "laundry worker" (DOT 361.685-018), "linen room attendant" (DOT 222.387-030), or "janitor" (DOT 381.687-018). (Tr. 26.) Accordingly, the ALJ determined that Ms. Milanowski was not disabled during the relevant period. (Tr. 27.)

## V.    LAW & ANALYSIS

### A.    <u>Standard of Review</u>

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 Fed. Appx. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g).

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (cleaned up) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The standard for "substantial evidence" is "not high." *Id*. While it requires "more than a mere scintilla," "[i]t means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (quoting *Consolidated Edison*, 305 U.S. at 229).

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, . . . a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)) (alteration in original).

### B.      Standard for Disability

Consideration of disability claims follows a five-step review process. 20 C.F.R. § 416.920. First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 416.920(b). Second, the claimant

24

must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990) (quoting 20 C.F.R. §§ 404.1520(c) and 416.920(c)).

Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. § 416.920(d).

Before considering Step Four, the ALJ must determine the claimant's residual functional capacity, *i.e.*, the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. 20 C.F.R. § 416.920(e). An RFC "is the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 416.945(a)(1). Agency regulations direct the ALJ to consider the functional limitations and restrictions resulting from a claimant's medically determinable impairment or combination of impairments, including the impact of any related symptoms on the claimant's ability to do sustained work-related activities. *See* Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 at *5 (July 2, 1996).

"A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner." *Golden v. Berryhill*, No. 1:18CV00636, 2018 WL 7079506, at *17 (N.D. Ohio Dec. 12, 2018), *report and recommendation adopted sub nom*, 2019 WL 415250 (N.D. Ohio Feb. 1, 2019). The ALJ is "charged with the responsibility of determining the RFC based on [the ALJ's] evaluation of the medical and non-medical evidence." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013). "[T]he ALJ must give some indication of the evidence upon which

he is relying, and he may not ignore evidence that does not support [the ALJ's] decision, especially when that evidence, if accepted, would change [the ALJ's] analysis." *Golden*, 2018 WL 7079506 at *17.

At the fourth step, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 416.920(e)–(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, the claimant is not disabled if other work exists in the national economy that the claimant can perform. 20 C.F.R. § 416.920(g). *See Abbott*, 905 F.2d at 923.

### C.     Analysis

A consideration of Ms. Milanowski's second assignment of error is dispositive of this administrative appeal.

In her second assignment of error, Ms. Milanowski argues that the ALJ erred in evaluating her fibromyalgia and her subjective symptoms. The ALJ discussed her fibromyalgia as follows:

> Looking first at the claimant's orthopedic problems and fibromyalgia, at a routine primary care visit in March of 2022, Susan Selim, M.D., noted that the claimant had a history of fibromyalgia, tendinitis of both wrists, and bursitis of her left hip and had been referred to a rheumatologist. Upon exam, Dr. Selim found no significant abnormalities and indicated that the claimant had a normal gait and no joint swelling. In July of 2022, the claimant told Dr. Selim that she had not yet been able to see the rheumatologist but was scheduled to see him the next few weeks.

> In August of 2022, the claimant visited rheumatologist Frank Migliore, M.D., who diagnosed her with fibromyalgia. Dr. Migliore noted that the claimant had not tolerated gabapentin in the past. He ordered bloodwork and told the claimant that they would follow up if it showed anything of concern. The bloodwork was completed and came back negative for acute inflammatory markers, and Dr. Migliore recommended that the claimant take over-the-counter Tylenol and anti-inflammatories for pain relief. However, the claimant stated that she could not take these medications because they caused stomach pain.

> In September of 2022, the claimant saw Lauren Wire, CNP, and explained that her myalgias were stable after being started on Cymbalta by her

psychiatrist. However, she continued to describe chronic pain in her knees and lower back. The claimant consulted with Jospeh Francisco, DPM, in December of 2022 after complaining of bilateral foot pain. Dr. Francisco took x-rays and diagnosed the claimant with pes valgus in both feet. He recommended conservative treatment with custom foot orthotics.

From the above, the claimant has some limitations related to her orthopedic problems and fibromyalgia. **However, during the relevant period she has required only conservative treatment, and the objective evidence has not revealed any underlying conditions that would support the levels of pain that the claimant has alleged.** Nonetheless, I have attempted to accommodate any residual symptoms by limiting her to work at the medium exertional level, with the additional postural and environmental restrictions described in the residual functional capacity.

(Tr. 23–24) (emphasis added).

Ms. Milanowski argues, pointing to the bolded language above, that an ALJ cannot use "normal" objective medical findings to "discredit a claimant's report of fibromyalgia." (ECF No. 8, PageID# 1412.) She further argues that the ALJ failed to comply with SSR 12-2p by failing to consider "all of the evidence in the case record" when deciding whether her subjective statements about her conditions were substantiated. (*Id.*, PageID# 1413.) Finally, she argues that an ALJ cannot rely on "conservative" treatment as evidence of non-disability, because there is no "cure" or more aggressive surgical intervention available. (ECF No. 8, PageID# 1414.)

SSR 12-2p sets out a roadmap for the ALJ in evaluating a claimant's fibromyalgia. 2012 WL 3104869, at *6 (July 25, 2012). SSR 12-2p provides that "[w]idespread pain and other symptoms associated with [fibromyalgia], such as fatigue, may result in exertional limitations" that prevent a person from performing a full range of unskilled work. *Id.* SSR 12-2p also states that people with fibromyalgia "may also have nonexertional physical or mental limitations because of their pain or other symptoms." *Id.*

Among other things, the ALJ must evaluate the claimant's subjective complaints pursuant to the two-step process set forth in SSR 96-7p. First, the ALJ must determine whether the claimant

27

has a medically determinable impairment that can reasonably be expected to produce the claimant's alleged symptoms. *Id.* Second, the ALJ must evaluate the intensity and persistence of the claimant's pain and other symptoms to determine the extent to which they limit the claimant's ability to work. *Id.* SSR 12-2p also provides that, given the distinct characteristics of fibromyalgia, the ALJ must "consider a longitudinal record whenever possible because the symptoms of [fibromyalgia] can wax and wane so that a person may have 'bad days and good days.'" *Id.* at \*6.

Importantly, although "the same factors are applied to fibromyalgia as to any [medically determinable impairment], caselaw demonstrates that [t]he nature of fibromyalgia undercuts the efficacy of many of these factors and muddies the legal analysis." *James v. Comm'r of Soc. Sec.*, No. 1:22-CV-1915, 2023 WL 4172932, at \*14 (N.D. Ohio June 5, 2023) (quotations omitted). That is because "unlike medical conditions that can be confirmed by objective testing, fibromyalgia patients present no objectively alarming signs." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007)). "Rather, fibromyalgia patients 'manifest normal muscle strength and neurological reactions and have full range of motion.'" *Id.* (quoting *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 820 (6th Cir. 1988)).

Moreover, because fibromyalgia presents without objectively alarming signs, cases involving fibromyalgia "place[] a premium on the analysis of subjective symptoms and, for purposes of judicial review, on the ALJ's articulation of the reasons supporting this analysis." *Jones v. Comm'r of Soc. Sec.*, No. 1:21-CV-01309-SO, 2022 WL 3567412, at \*10 (N.D. Ohio July 20, 2022), *report and recommendation adopted*, 2022 WL 3566791 (N.D. Ohio Aug. 18, 2022). As the Sixth Circuit has held, "where subjective pain complaints play an important role in the diagnosis and treatment of the condition, providing justification for discounting a claimant's

28

statements is particularly important." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007).

Here, the ALJ found fibromyalgia to be a severe impairment at Step Two, in addition to tendinitis, bursitis, pes valgus, degenerative disc disease, and mental impairments. (Tr. 20.) The ALJ to some extent acknowledged Ms. Milanowski's testimony about those conditions, noting that she alleged that she cannot lift more than five pounds; cannot stand for long periods of time; has a slow pace; and has limitations with respect to her ability to squat, bend, reach, walk, sit, kneel, climb stairs, and use her hands. (Tr. 23.) The ALJ also acknowledged her testimony that her condition is declining, such that she now needs ankle braces and uses a cane. (*Id.*)

The ALJ then concluded that Ms. Milanowski's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but he concluded that her statements about the intensity, persistence, and limiting effect of those symptoms are not entirely consistent with the record evidence. (*Id.*)

But the only explanation the ALJ provides for that conclusion is that Ms. Milanowski "has required only conservative treatment" and "the objective evidence has not revealed any underlying conditions that would support the levels of pain that the claimant has alleged." (Tr. 24.)

I therefore agree with Ms. Milanowski that the ALJ failed to properly evaluate her fibromyalgia, including her subjective reports regarding her condition. Because fibromyalgia presents without objectively alarming signs, "the Sixth Circuit has described the lack of corroborative findings as 'basically irrelevant' in the context of analyzing fibromyalgia symptoms." *Fyffe v. Comm'r of Soc. Sec.*, No. 1:21-cv-332, 2022 WL 2176538, at *10 (N.D. Ohio June 16, 2022) (quoting *Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 864 (6th Cir. 2011)).

Nonetheless, the ALJ appears to have discounted Ms. Milanowski's fibromyalgia primarily—if not exclusively—because her physical examinations were normal.

An ALJ's reliance on a lack of objective findings may not require remand where the ALJ also relies on other considerations such as a claimant's activities of daily living or improvement with treatment. *See, e.g.*, *Hardman v. Berryhill*, No. 5:16CV2795, 2018 WL 1545707, at *17–18 (N.D. Ohio Mar. 5, 2018) (holding that ALJ's reliance on relatively benign clinical findings did not constitute reversible error where ALJ also relied on improvement on claimant's condition and claimant's testimony regarding activities of daily living). Here, though, the ALJ did not rely on Ms. Milanowski's activities of daily living or other evidence in the record to determine that a more-restrictive RFC was unwarranted.

It is true, as the Commissioner argues, that the ALJ briefly mentioned some activities of daily living when discussing the Paragraph B criteria at Step Two. (*See* Tr. 21–22.) The ALJ noted that Ms. Milanowski "could perform simple maintenance, go to doctor's appointments, take medications, and play games" and "is also able to watch TV, use the internet, and handle her own medical care." (*Id.*) But even reading the decision as a whole, it is not at all clear that the ALJ considered these activities when considering Ms. Milanowski's fibromyalgia. To the contrary, the ALJ repeatedly referred only to "objective evidence" and "conservative treatment." (*See* Tr. 24; *see also* Tr. 25 (finding the agency medical consultants' opinions persuasive because "the evidence during the relevant period shows only conservative ongoing treatment and the objective findings do not suggest dysfunction or pain at the levels described by the claimant").

Moreover, while the ALJ did discuss some of Ms. Milanowski's treatment for pain and related conditions during 2022, there is no indication of what, if any, conclusions he drew from

30

that treatment. For instance, it is unclear to me whether the ALJ found that Ms. Milanowski's fibromyalgia was controlled with treatment.

In sum, the ALJ's decision does not adequately explain why he discounted Ms. Milanowski's subjective complaints regarding her fibromyalgia in light of the unique nature of that condition. Remand is therefore warranted. *See Cooper v. Comm'r of Soc. Sec.*, No. 3:22-CV-01248-JRK, 2023 WL 4078982, at *14 (N.D. Ohio May 3, 2023) ("The Sixth Circuit's ruling in *Rogers* requires a district court remand where an ALJ considering fibromyalgia dismisses a claimant's subjective statements in favor of objective findings."), *report and recommendation adopted*, 2023 WL 4699650 (N.D. Ohio July 24, 2023); *James v. Comm'r of Soc. Sec.*, No. 1:19 CV 570, 2020 WL 836493, at *7–8 (N.D. Ohio Feb. 20, 2020) (holding that lack of objective evidence "does not provide a sufficient rationale for discounting fibromyalgia symptoms" and remanding in light of "Plaintiff's complaints of chronic pain [and] the ALJ's repeated focus on the 'objective medical evidence'"); *Jones*, 2022 WL 3567412, at *12 ("The ALJ's articulated reasons for rejecting [claimant's] fibromyalgia diagnosis as 'self-reported' and otherwise not supported by objective findings such as exhibiting normal strength and range-of-motion testing do not constitute substantial evidence supporting the ALJ's RFC finding.").

None of this is to say that Ms. Milanowski is necessarily disabled. To the contrary, the Sixth Circuit has held that a diagnosis of fibromyalgia "does not automatically entitle [the claimant] to disability benefits . . . ." *Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 806 (6th Cir. 2008). "Some people may have a severe case of fibromyalgia as to be totally disabled from working . . . but most do not and the question is whether [the claimant] is one of the minority." *Sarchet v. Chater*, 78 F.3d 305, 306–07 (7th Cir. 1996). But governing law required the ALJ to evaluate Ms.

31

Milanowski's fibromyalgia without placing undue weight on the lack of objective evidence during physical examinations.

Here, where the ALJ barely acknowledged Ms. Milanowski's statements about her pain (from her function report, to her testimony, to her statements to treating professionals), and where the ALJ discounted her subjective fibromyalgia symptoms based only on conservative treatment and a lack of objective evidence substantiating the pain, I find that the ALJ failed to evaluate Ms. Milanowski's fibromyalgia without placing undue weight on the lack of objective evidence.

I therefore recommend that the Court sustain Ms. Milanowski's second assignment of error.

## VI.	RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court REVERSE the Commissioner's decision and REMAND the case to the Commissioner for further consideration of Ms. Milanowski's fibromyalgia and for the issuance of a new decision.

Dated:  June 18, 2026                            /s/ *Jennifer Dowdell Armstrong*
                                                 Jennifer Dowdell Armstrong
                                                 U.S. Magistrate Judge

## VII.	NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

> **Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a <u>de novo</u> determination of those

portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878–79 (6th Cir. 2019).